## Welsh *versus* Cabot *et al.*

*Lien on Ship for necessary Repairs and Supplies.—Bottomry Bond, how Satisfied.—Implied Lien for Repairs, how waived.*

1. In cases of bottomry where the ship and cargo belong to different persons, the bond is to be first satisfied out of the proceeds of the ship, the cargo being only secondarily liable, but where both belong to the same owner and are both hypothecated, there is no equity which prevents the owner of the bond from resorting to either; so, also, where the ship and freight have the same owner and are included in the same hypothecation.

2. The owner of a ship executed two mortgages upon it, bearing date the same day, the second being subject to the first, and afterwards, when the vessel was upon a voyage, assigned the homeward freight to the holder of the second mortgage as collateral security for the payment of the balance due thereon: subsequently, a bottomry bond was executed by the master in a foreign port on the ship and her freight to secure advances for repairs. Upon the distribution of the proceeds of the sale of the ship after its return, and the collection of the freight and general average, which was a contribution for the repairs, it was held, that the bottomry bond, after the general average fund, less some necessary expenses should be paid *pro rata* out of the freight and the net proceeds of the ship; that the unappropriated freight was to be paid to the assignee thereof, and that the unappropriated proceeds of the ship were to be paid to the other mortgagee.

3. Where money was advanced for the repairs of a vessel in a foreign port, and bills of exchange drawn by the master upon the owner were taken therefor, the advances were held to have been made upon the personal security of the owners and not upon the credit of the ship, and that a waiver was to be inferred of any implied lien upon the ship, which else might have existed under the circumstances.

CERTIFICATE from Nisi Prius. In Equity.

On the 1st of July 1858, Samuel Welsh, John Welsh, and William Welsh, trading as S. & W. Welsh, filed a bill in equity against Joseph Cabot, liquidator of the firm of Bevan & Humphreys; John M. Odenheimer, and Samuel C. Cook, trading as Odenheimer & Cook; George N. Diehl and John H. Diehl, trading as Diehl & Co.; and Thomas Rich, executor of James Christie Rogers, deceased.

The bill set forth in substance, that, in the month of April 1855, Diehl & Co. were the owners of the ship Venice, a vessel of the burthen of 558 tons, or thereabouts, at the timelying in the port of Philadelphia, which recently performed a voyage from the port of Calcutta, by which she had earned a large and valuable freight, which was as yet unpaid to her owners.

That the said vessel left the port of Calcutta on the 15th day of September 1854, and shortly afterwards meeting with tempestuous weather, was greatly damaged, and was forced to put back to that port, for the purpose of undergoing repairs. That the master thereof, one Charles Frederick Brevoor, obtained the moneys with which he defrayed the expenses of making the

[Welsh *v.* Cabot *et al.*]

repairs to the vessel from James Christie Rogers, who was, at
the time, living and doing business as a merchant in the city of
Boston, to whom, for the better securing the advances so made
by him, he executed a bottomry bond, at the port of Calcutta,
on the 6th day of December, in the year aforesaid, conditioned
for the payment of $15,727, at or before the expiration of ten
days from the date of the vessel's arrival at the port of Phila-
delphia. That at the time the said vessel was lying in the port
of Philadelphia, as aforesaid, the said bond remained unsatisfied,
and that the expenses of making the said repairs were as yet
the subject of a general average adjustment.

That James Christie Rogers, the decedent aforesaid, and the
defendants, Joseph Cabot, and Odenheimer & Cook, had pre-
sented certain claims against the said defendants, Diehl & Co.,
which they represented were chargeable on the said ship Venice
and her homeward freight.

That the said James Christie Rogers represented himself as
being the holder of two bills of exchange, the one for the sum
of $289.58, and the other for the sum of $4955.48, both under
date at Calcutta, the 13th day of September 1854, and payable
to his order at sixty days after sight, and drawn by Charles
Frederick Brevoor, the said master, upon the said Diehl & Co.,
the owners of said vessel. That the said James Christie Ro-
gers alleged that the said bills of exchange were delivered to
him by the said master, in payment of certain disbursements
made by him for and on account of the said ship Venice, whilst
the same was lying in the port of Calcutta, and that, for his
better security, the payment of the same was made chargeable
on the said vessel, as well as on the owners thereof, and that the
same were as yet unpaid.

That Joseph Cabot was the liquidating partner of the firm of
Bevan & Humphreys, a firm composed of Messrs. Matthew L.
Bevan, David E. Wilson, Horne Humphreys, and the said Joseph
Cabot, formerly doing business as merchants in the city of Phila-
delphia. That said Cabot represented that on the 5th day of
December 1853, Diehl & Co. had executed to him, as the liqui-
dating partner as aforesaid, an assignment of the homeward
freight from Calcutta to Philadelphia of the said ship Venice.
That he was possessed of a mortgage of the said vessel to secure
the payment of $11,000, which mortgage was given to the firm
of Bevan & Humphreys on the 4th day of March 1852, by Diehl
& Co., who were at the time the owners of said ship. And that
the said assignment, as well as the said mortgage, had been exe-
cuted by the said Diehl & Co. as security for the payment of a
certain balance of account remaining due from them to the said
firm of Bevan & Humphreys, and which as yet re-mained unsat-
isfied.

That the said defendants, Odenheimer & Cook, represented that on the 4th day of March 1852, Diehl & Co., being at the time the owners of the ship Venice, executed to them a mortgage of said vessel, to secure the payment of $7500, being the amount of a certain promissory note given to them by the said Diehl & Co., and which was as yet unpaid.

That on the 21st day of April 1855, the claims of the said James Christie Rogers, and of Joseph Cabot and Odenheimer & Cook, as aforesaid, against Diehl & Co., and against the said ship Venice, whereof at the time the said Diehl & Co. were the owners, and against the freight earned by the said vessel on her homeward voyage from Calcutta· to Philadelphia, were and remained unsatisfied, and that the said parties, together with the defendants, Diehl & Co., as aforesaid, being desirous of securing an amicable adjustment of their several claims, entered into a certain agreement, which was in writing, and bearing date as aforesaid, stipulating that the homeward freight of the said ship Venice from Calcutta to Philadelphia, together with the contribution of the cargo, under the general average adjustment aforesaid, should be collected, and the same, after deducting the inward expenses of said vessel, and such other expenses as should be absolutely necessary for the preservation of the same, should be paid into the hands of S. & W. Welsh. That the said ship Venice should be sold by either of the parties to said agreement, at such a price as they should afterwards agree upon; but that, should the same not be disposed of at private sale before the expiration of forty days from the date of said agreement, then the same should be sold at public sale for the best price that should be obtained, and the proceeds thereof should be paid into the hands of S. & W. Welsh.

That out of the fund so placed in their hands, they should satisfy the bottomry bond executed to the said James Christie Rogers, as aforesaid. That the claims of the several parties should be submitted to St. George Tucker Campbell, Esq., counsellor at law, as arbitrator upon a case to be stated, with liberty to either party to appear before him, in person or by counsel; the decision of the said arbitrator in the premises to be final and conclusive. And that the balance of moneys remaining in the hands of petitioners, after satisfaction of the bottomry bond aforesaid, should be paid out and distributed by them in accordance with the decision of said arbitrator.

The bill further set forth that subsequently, to wit, in the month of May next following, *and at divers times thereafter*, under and by virtue of the said agreement, the said ship Venice was sold, and the homeward freight of the said ship and the contribution of the cargo, under the general average adjustment collected, and that the proceeds of such sale, together with the

[Welsh *v.* Cabot *et al.*]

amounts of the said freight and general average contribution, were paid over into the hands of S. & W. Welsh, amounting in all to the sum of $28,502.71, and that they, out of the moneys so coming into their hands, in accordance with the terms of said agreement, satisfied the bottomry bond executed to the said James Christie Rogers, and paid the inward expenses of said vessel, and such other expenses as were within the terms of said agreement; and that on the 28th day of October 1855, there remained in their hands, to be paid out and distributed among the several claimants, subject to the decision of the said arbitrator, the sum of $8708.84.

A statement of the particulars of the moneys so received and paid out by them was annexed and made a part of the bill.

That the said defendants, and the said James Christie Rogers, the decedent aforesaid, notwithstanding their agreement, from some cause or causes unknown, failed to submit their claims to the said arbitrator, and that no decision was had thereon, and that there still remained in their hands the said sum of $8708.84 as aforesaid.

That subsequently, after he had entered into and signed the agreement aforesaid, and after the payment into their hands, under and by virtue of the same, the moneys aforesaid, the said James Christie Rogers died, having first made his last will and testament, wherein he disposed of all his estate, and named and appointed, as the executor thereof, the said Thomas P. Rich, of the city of Boston, one of the defendants.

That the said defendants, Thomas P. Rich, executor as aforesaid, Joseph Cabot, and Odenheimer & Cook, had given notice of their several claims, and insisted upon the said sum of money so remaining in their hands being paid to each of them, and each of them threatened to bring an action for the recovery thereof.

That they are advised that, under the circumstances, they cannot with safety pay the said sum of money to either of the said defendants, or distribute the same among them. But that they, the said defendants, ought to interplead together, touching their rights to the same, and settle and adjust their respective rights and demands between themselves, in order that it may be known to whom the said' sum of money ought to be paid. And the said defendants ought to be restrained by the order and injunction of the court from prosecuting, proceeding in, or commencing any action or actions at law, for and in respect of the matters aforesaid.

To this bill were appended the usual and proper interrogatories, with a prayer for a *subpœna* to be directed to the defendants named in the bill, and a prayer for relief, &c.

On the 16th of March 1859, the answer of Joseph Cabot was

[Welsh *v.* Cabot *et al.*]

filed, admitting the introductory facts in the bill as to the voyage, the earning of freight, the injury sustained by the Venice, the repairs, the execution of the bottomry bond—that it had not been satisfied; that the expenses of the repairs were the subject of a general average adjustment; that he, as well as Odenheimer & Co., and J. Christie Rogers, had presented claims as chargeable on the ship and freight, and that Rogers was the holder of two bills of exchange drawn by the master upon Diehl & Co., the owners, but denying that the ship was ever hypothecated for the payment of these bills of exchange.

The answer further averred that Diehl & Co., were indebted to the late firm of Bevan & Humphreys, at the time of its dissolution, in the sum of $11,000, which is still unpaid; that to secure this balance Diehl & Co., on the 4th of March 1852, being the owners of the Venice, executed a mortgage to them of the ship for this amount, which was duly recorded. That on the 1st of August 1853, being anxious to collect this sum, he compromised with Diehl & Co., who, in consideration of his forbearing to enforce the claim, agreed to pay in cash $6000, and give additional security for the balance, but that instead of the cash payment they gave him notes of Hussy, Bond & Hall, of New York, for $4900, falling due September 1854, and afterwards, to wit, December 5th 1854, assigned to him the homeward freight of the Venice, then lying at New York, and bound on a voyage to Calcutta, under a charter-party, with one Edward T. Smith; that the mortgage and the said homeward freight are still unpaid.

That on the 18th of May 1855, he submitted to Diehl & Co. a statement of their account with Bevan & Humphreys, crediting them with the notes of Hussy, Bond & Hall, showing a balance of $8157.86, which was admitted to be correct, and is due and unpaid.

The claim of Odenheimer & Cook was not denied; the making of the agreement of the 21st of April 1855, as stated in the bill, was admitted, together with the sale and the receipt of the moneys, the disbursements and the balance in the hands of S. & W. Welsh, as stated in the bill, averring a willingness to submit his claim to the arbitrator named, and the failure on the part of the other claimants to join for that purpose. The interrogatories were then answered, and the answer closed with a prayer for a decree, commanding the parties to interplead together, as prayed for in the bill, and directing the payment to him as liquidator of Bevan & Humphreys, the amount of their claim, with costs, &c.

On the 6th of May 1859, the answer of Samuel Cook (who survived his partner, John M. Odenheimer) was filed, in which the general facts as laid in the bill were admitted, but denying

[Welsh v. Cabot et al.]
that the statement of moneys received and paid by S. & W. Welsh is correct, indicating an item of $2400 as one which he cannot understand, and of which he has no knowledge, and complaining that it is incorrect and deficient, and that the complainants do not charge themselves with interest upon the whole account, as was agreed upon; averring at all times a willingness to submit his claim to the arbitrator named, and the failure of the other claimants to unite with him for this purpose. The interrogatories were then answered, and the answer concluded with a prayer for a decree, commanding the parties to interplead as prayed for in the bill, and directing the claim of Odenheimer & Cook to be paid out of the fund.

On the 5th of November 1859, a decree, *pro confesso*, was taken against Thomas P. Rich. December 23d 1859, the answer of Diehl & Co. was filed by John H. Diehl, surviving partner, in which it was admitted that Diehl & Co. do not claim to have any interest in the fund in the hands of S. & W. Welsh, paramount to the claims of the other defendants.

On the 9th of February 1860, the answer of Thomas P. Rich, executor of James Christie Rogers, was filed, in which he stated that although he has no personal knowledge of the facts, he believes the general statement as to ownership of the vessel; the voyage to Calcutta; the earning of the freight; the damages; the repairs; the obtaining of the money by the shipmaster from Rogers, and the execution of the bottomry bond as security therefor. That the estate of Rogers holds two bills of exchange, as stated in the bill, and averring that they were given for moneys advanced to the said master, to pay port charges at Calcutta, and for the outfit of the vessel from that port, without which she could not have departed from the port, or continued her voyage; by reason of which facts, and of the character of the advances so made, and for the better securing the same, were made chargeable as well on the vessel as on the owners thereof, and on her homeward freight. He further answered, that he had no knowledge of the claims of Bevan & Humphreys, or of Odenheimer & Cook, but did not deny their correctness; admitted the existence of an agreement between the parties for adjusting the claims on the fund, and averred his willingness at all times to submit the disputed questions to the arbitrator; that he believed the balance in the hands of S. & W. Welsh, as stated in their bill, to be correct, but desired that it be vouched and adjusted under the order of the court, and expressing his belief that the rights of the parties should be ascertained and defined by a decree of this court, &c.; to which were added answers to the interrogatories accompanying the bill.

To this answer the complainants filed a general replication,

and on motion, an examiner was appointed to take and report evidence in the case, and also to report the facts proven thereby.

The examiner reported the testimony taken by him, and returned as "facts thereby proven" the following, viz. :—

"1. That the two bills of exchange put in evidence, represent expenditures for port charges and other expenses made at the port of Calcutta, during the first stay of the vessel at that port; that the same were indispensable expenditures of the ship, which the master was not otherwise provided with the funds to meet; that no bottomry or other specific lien upon the vessel was either asked for or given to protect the moneys represented by these bills; and that the charges and expenditures referred to are those shown in the exhibit appended to the answer of Thomas P. Rich.

"2. That Captain Brevoor, the master of the vessel, had been assured by letter, that he would receive at Calcutta, on his arrival, a letter of further instructions, on applying to Foster, Rogers & Co., to whose care it would be sent, but that none was received or appeared to have been sent, although frequently inquired for by the master during upwards of six months, which elapsed between his first arrival at, and his final departure from, that port, subject to the objection taken to its relevancy, and to its admissibility under the cross-examination.

"3. But that the allegation of Rich, executor of Rogers, that it was the belief of the parties (whether erroneously or not), when the said bills were drawn and the money advanced, that thereby the holder of the bills had the ship as security, was not supported.

"4. He also found that the moneys represented by the bills in question, were advanced on the personal credit of the master and owners, and not upon any pledge of either vessel, cargo, or freight."

To this report, *Theo. Cuyler,* for T. P. Rich, filed the following exceptions :—

1. The examiner erred in declining to report as requested. That it was the belief of the parties to the giving of the drafts at Calcutta, that by reason of said drafts or bills, they had the vessel as their security. And,

2. The reporting that said drafts were given and received on the faith of the personal security of the drawers.

It being apparent, on the uncontradicted evidence before him, that the parties did believe (whether erroneously or not) that they had the vessel as their security, and that they did not rely upon, or have faith in, the responsibility of the parties upon whom said drafts or bills were drawn.

The judge at Nisi Prius entered a decree *pro forma*, overruling the exceptions to the finding of the examiner, disallowing the

[Welsh v. Cabot et al.]

claim of Rich, executor of Rogers, giving priority to the defend-
ant Cabot, and decreeing to him the sum of $8708.84. On the
application of Rich, executor of Bogers, and of Odenheimer &
Cook, the case was then certified to the court in banc, where the
decree of the Court of Nisi Prius was assigned for error.

*Theo. Cuyler*, for Rich, appellant.—The ship Venice had
reached Calcutta, from Australia, in July 1854. Her captain
was wholly unsupplied with funds to meet the ship's disburse-
ments, having relied upon remittances which her owners had
assured him would be made to the consignees in that port in
advance of his arrival. Upon arriving he found no letters await-
ing him, and no remittance made; and, during the period of
more than two months he remained in that port, not a line was
received from the owners. Thus he was left penniless in a
foreign port; his port charges to be paid; his ship to be re-
fitted; and her expenses for repairs, supplies, &c., to be met.

They were met by Mr. Rogers, through his mercantile house
of Foster, Rogers & Co. He furnished the money, amounting
to nearly $5300.

These debts included the very towage and pilotage, without
which she could not have entered the port; the food and wages
of her crew; and the repairs and outfit, without which she never
could have put to sea again. He had, for this large amount of
money, no specific lien created by a written pledge, but he
believed, and the captain believed, and so stated to him, and on
the faith of it he made the advance, that the vessel and her
freight and cargo were bound to him for his advance so made.

It is proposed to show that this was not a mistaken opinion.

Advances made for the necessary expenditures of the ship, in
foreign ports, are a lien upon the vessel, her freight and cargo,
without a specific pledge: The Virgin, 8 Peters 538, 550;
Peyroux v. Howard, 7 Id. 324, 340; Carrington v. Pratt, 18
Howard 63.

This case, cited by the counsel of Cabot, expressly recognises
the implied lien for advances; and, although it refers to Stain-
bank v. Shepherd, it expressly declines to express an opinion
upon its value as an authority in this country.

See, also, The General Smith, 4 Wheat. 438; The St. Jago de
Cuba, 9 Id. 416; Gardner v. The New Jersey, 1 Peters' Adm.
Rep. 223; Ex parte Halkett, 3 Ves. & Beames 136; Abbott on
Shipping (Story & Perkins' edition), p. 148, and the note.

See, also, a digest of the authorities on this point, in the note
to Hussey v. Christie, 13 Vesey 594, Sumner's edition; Story's
Equity Juris., § 1241.

The taking of the bills of exchange does not waive the lien:
Ex parte Halkett, 3 Ves. & Beames 136; Peyroux v. Howard,
7 Peters 345.

[Welsh *v.* Cabot *et al.*]

In the case of vessels, the last lien is first paid, &c.: The St. Jago de Cuba, 9 Wheat. 416.

The equity of the claim of Rogers is altogether superior to that of the other claimants.

The safety of the vessel, the continuance of her voyage, and the earning of the freight, were altogether due to the advance made by him, and now reclaimed by his executor in this case.

*Geo. M. Wharton* and *R. P. Kane*, for Joseph Cabot.—The contest for the fund in the hands of the Messrs. Welsh, who have themselves no interest in it, is between the defendants in the bill of interpleader.

The money in the hands of the Messrs. Welsh arose from the proceeds of the sale of the ship, from the homeward freight, and from the general average collected from the cargo.

Joseph Cabot, representing Bevan & Humphreys, claims it by reason of a special assignment, for value, of the homeward freight of the ship Venice, from Calcutta to Philadelphia, executed by Diehl & Co., in his favour, on the 5th of December 1853. She was under a charter to Edward T. Smith, for that voyage. Diehl & Co. were the owners.

The ship arrived at Philadelphia, and earned her freight. During her voyage from Calcutta she encountered sea damage, and was compelled to put back to that port for repairs; the money with which to do this, was obtained on bottomry from J. C. Rogers. After the repairs were completed, the ship sailed again for Philadelphia, where she arrived safely.

After payment of expenses, the bottomry bond of Mr. Rogers was discharged, and the dispute arose as to the proper distribution of the residue, which remained in the hands of the Messrs. Welsh.

The question depends, in part, upon the correct statement of the subjects upon which the bottomry bond is to be legally charged.

The bond is first to be debited to the proceeds of sale of the ship, and only after these are exhausted, is the freight to be resorted to, because the money borrowed and expended was for the repairs of the ship. Except that portion of it which became general average, the money was solely for the use of the vessel, and should be repaid by her. In point of fact, the proceeds of the vessel were insufficient to discharge the bottomry bond. For the residue of it, the freight was called upon, together with the general average. What is left of the freight is, clearly, the property of Mr. Cabot, under the assignment of it by Diehl & Co. The mortgagee of the ship can have no claim upon it: The Packet, 3 Mason 255; The Gratitudine, 3 C. Robinson 263; The Dewthrope, 2 Wm. Rob. 85.

[Welsh v. Cabot et al.]

The assignment of the freight was for an undoubtedly valuable consideration. The paper itself proves this. And as to the balance due to Mr. Cabot, it was clearly proved.

As to the claim of Mr. Rogers on his bills of exchange, the examiner reports that the money was not advanced on pledge of either vessel, cargo, or freight, but upon the personal credit of the master and owners. He has no lien, therefore, by contract.

Besides, in law, to have acquired one, he should have taken for these advances a bottomry bond, as he did in the other instance of money lent for the repairs.

This is the law in England (Stainbank v. Shepherd, 76 E. C. L. 417), and the rule seems to be approved by the Supreme Court of the United States, in Carrington v. Pratt, 18 How. 69.

*Benj. H. Brewster*, for Odenheimer & Cook.—The assignment of a ship carries with it the freight as an incident: Morrison v. Parsons, 2 Taunton 407. The mortgagee of a ship is entitled to freight accruing after mortgage: 4 Bingham 45; 12 Moore 185; 2 Car. & Payne 387; and the policy of the law is against separating the ship and its earnings. But it may be assigned to secure a debt *cum onere*, to wit, such hazards as in this case, the risk of paying a bottomry bond given to repair, without which no freight could be earned: 1 Scott 87; 13 Vesey, Jr. 588. Without the ship there can be no freight, and charges put upon it to earn freight must, as between the owner or his assignee of the freight, and a mortgagee whose security is impaired by the bond given to protect their expenses, be charged upon the freight.

If the ship, in this case, had not been repaired at Calcutta, no freight would have been earned. If sold there, the proceeds would have belonged to Odenheimer & Cook. Why charge them with the sole expenses of the bottomry, which was the exclusive cause of the freight being earned?

The payment of this freight to Cabot, the assignee of the owner, is for the owner's benefit, for it pays the debt to secure which it was assigned. Diehl & Co. could not claim this freight as against Odenheimer & Cook, nor can their assignee. It is pledged to pay all charges, and this is included. Whoever took the freight did so subject to our ability to earn it, which was wholly owing to the encumbrance placed on our pledge, and which it is now said we must pay.

The freight should be paid to extinguish the bottomry bond in favour of our prior lien, and especially against an assignee of the freight who took it as a further security to a mortgage which was itself subject to that lien, and with notice of its priority, and

who in express terms surrendered his priority to us, and cannot now by indirection supersede it.

In England we could in equity enjoin the holder of the bottomry bond proceeding in admiralty to take freight before he took the ship: 3 Haggard 403. We are in equity here, and have the same rights on the distribution of this fund.

Our right is absolute as against the assignee of the owner : 2 W. Robinson 73, 80, 88. Diehl & Co. had an equity of redemption only ; after that they mortgaged to Cabot, who took subject to our lien. Where there are two creditors, one with a double and the other a single security, the court will compel the former so to resort to his double security as to enable the other to be paid.

See Pritchard's Analytical Digest, Library of Law and Equity, vol. 12 and 13, p. 95, for an application of this principle to cases like the present.

The cases cited on the other side, from 3 Mason, and 5 Jurist 773, are not like this. The cases in 1 W. C. C. Rep. 226, 1 H. Blackstone 114, and 4 W. & S. 240, rest on a principle which should rule this case in our favour. So also the case of Briggs *v.* Wilkinson, 9 Dow. & Ry. 874. It is well settled that freight must pay all expenses, charges, and outlays incurred in earning it.

There were three funds in the hands of Welsh & Co., viz. : the freight, the proceeds of the sale of the ship, and the general average contribution ; if the bottomry bond was a paramount charge on all three, they should contribute rateably, and beside this was the agreement of the parties. There are also several inadmissible items in the claim represented by Cabot. The mortgage and assignment of the freight were both for one specific debt of $11,000 ,on which certain notes of Hussy, Bond & Hall for $4900 were received on account. Nothing but the balance, with proper debit and credit of interest, can be allowed.

The opinion of the court was delivered, June 10th 1861, by

STRONG, J.—It was an undoubted rule of civil law, that he who had repaired or furnished necessary supplies for a ship, or who had lent money to be employed for those purposes, had a lien, and was entitled to payment out of the proceeds of the ship, in preference to other creditors, even without an express contract of hypothecation. The rule still prevails in those tribunals which have adopted the civil law as the basis of their jurisprudence. It has found less favour, however, in England, and it was early denied as applicable to repairs and necessaries furnished in that country. Neither a court of admiralty, nor any other court, recognises an implied lien—a lien without express contract—in favour of a shipwright who has once parted with the possession of a ship, or has worked upon it without

[Welsh v. Cabot et al.]

taking the possession; or in favour of a tradesman who has provided necessaries; or in favour of one who has lent money to make repairs or provide necessaries for an English vessel in any of the ports of England. And in regard to repairs made and supplies furnished in foreign ports, though there are some early cases which adopted the rule of the civil law, the tendency of modern decision has been to hold that there is no lien without an instrument of hypothecation. The question came directly before the King's Bench, in Hussil v. Christie, 9 East 426, and it was ruled that a master who had made payments abroad for necessary repairs, had no lien on the ship—nothing more than a personal claim against the owners. This case was followed by Smith v. Plumer, 1 Barn. & Ald. 575, which reasserted the doctrine. These were cases, it is true, in which the existence of an implied lien *in favour of the master* was denied. But there would seem to be even less reason for sustaining a lien in favour of a stranger. He may insist on having the ship pledged to him as a security, and the authority of the master in a foreign port to pledge it, in a case of necessity, is undoubted. But the master cannot hypothecate to himself. If he may not have an implied lien for repairs, he can have no lien at all. And in Steinbank v. Fenning, 73 E. C. L. R. 50, a case in which the person who advanced the money for repairs was not the master, it was distinctly laid down that no lien for supplies furnished, or for repairs, or for money lent for those purposes, can be acquired, except by express agreement. See also Stainbank v. Shepherd, 76 E. C. L. R. 417.

The American cases, it must be admitted, have inclined more to the doctrine of the civil law. Though they are not harmonious, the majority of them unquestionably recognise the existence of an implied lien upon the ship for repairs made or supplies furnished in a foreign port. Such is the doctrine of the Massachusetts and New York courts, and such has been the ruling of the Supreme Court of the United States.

But an implied lien does not necessarily arise out of the mere fact that necessary supplies have been furnished for the ship. They must have been furnished on the credit of the ship, and whenever it appears that the ship was not relied on originally, but the personal security of the master or owners, or others was taken, there is no lien. To this the authorities generally agree, and for the best reasons. If such a lien can exist at all, it is an anomaly, not because it exists independently of possession of the ship, but because it is evidenced neither by possession nor by writing, and is created by one who is not the owner. It ought not, therefore, to be regarded with favour. He who claims such an unusual right ought to show that his money was advanced in reliance upon it. In Carrington v. Pratt, 18 Howard 63, it was said to "be well settled that the lien implied by the general

3 Wr.—23

admiralty law may be waived by the express contract of the parties, or by necessary implication; and the implication arises in all cases where the express contract is inconsistent with an intention to rely upon the lien. A familiar instance is, where the money is advanced, or repairs made, looking solely to the personal responsibility of the owner or master. In that case, no credit being given to the vessel as a security, the unpaid lien is necessarily displaced." In the case of Murray *v.* Lazarus, 1 Paine 576, it appeared that expenses had been incurred for repairs in a foreign port, and the master of the vessel had drawn a bill for the amount. The court said, "Where an express contract has been entered into for the payment of such expenses, that must be resorted to, and will be considered a waiver of such implied lien, if any existed." "If this is to be considered a regular and ordinary bill of exchange, it was a substitute for any lien that might have existed, and must be considered as a relinquishment thereof." And in 2 Woodbury and Minot 92, Leland *v.* The ship Medora, Judge Woodbury said: " "If the evidence show that the ship was not relied on originally, though foreign, but the master or owners, or other security were, the lien does not attach anywhere, or under any form.'

Taking this to be the law, we are of opinion that Thomas P. Rich, as executor of the will of James Christie Rogers, has no lien upon the fund in dispute. For the money advanced, Mr. Rogers took regular bills of exchange, drawn by the master upon Messrs. Diehl & Co., the owners, payable sixty days after sight. There was no special agreement to hypothecate the vessel as a security for the advances, and within less than three months after the bills were drawn, Mr. Rogers took a bottomry bond for other and greater sums advanced for repairs to the same vessel. All this is inconsistent with the allegation that the first advances for which the bills were taken, were made on the credit of the ship, and it shows a waiver of the implied lien which might under the circumstances have existed. In addition to this, the master (to whose report no exception was taken) has found on the evidence, "that the moneys represented by the bills in question were advanced on the personal credit of the master and owners, and not upon any pledge of either vessel, cargo, or freight." He has also refused to find (though asked to find it), "that it was the belief of the parties, whether erroneously or not, when the said bills were drawn and the money advanced, that thereby the holder of the bills had the ship as a security." The facts already stated, and those found by the master, negative the existence of any lien in favour of this appellant upon the ship, and his appeal is therefore dismissed.

The claimants to the fund are thus reduced to two, Odenheimer & Cook, and Joseph Cabot, liquidator of the firm of

[Welsh v. Cabot et al.]

Bevan & Humphreys. The facts out of which their respective claims arise may be very briefly yet sufficiently stated. Diehl & Co. were the owners of the ship Venice. On the 4th of March 1852, they mortgaged the ship to Odenheimer & Cook, to secure the payment of $7500 advanced to them on that day. On the same 4th of March 1852, they executed another mortgage on the ship to Bevan & Humphreys, to secure the payment of a debt of $11,000, an ascertained balance of a previous account between the parties. This mortgage was by its terms made posterior in lien to that given to Odenheimer & Cook. On the 29th of August 1853, a charter-party was made between the owners of the ship and a certain Edward T. Smith, by which the latter agreed to furnish a full return cargo from Calcutta to Philadelphia. Subsequently, on the 5th of December 1853, Diehl & Co. assigned the homeward freight from Calcutta to Philadelphia, under the charter-party, to Joseph Cabot, liquidating partner of the firm of Bevan & Humphreys, as collateral security for the payment of the balance of the said sum of $11,000 remaining unpaid. In the autumn of 1854, the ship having taken on board at Calcutta her cargo, put to sea on her return voyage; but meeting with stress of weather was obliged to put back for repairs. To obtain the necessary funds, the master executed to James Christie Rogers a bottomry bond, dated December 6th 1854, upon the ship *and her freight* for the sum of $15,77.727, payable ten days after the arrival of the ship in Philadelphia. After the return of the ship to this port, by consent of all parties in interest, the ship was sold, the freight and general average collected, and the entire proceeds, after deducting some expenses, were placed in the hands of Messrs. S. & W. Welsh, and out of the entire fund thus raised the bottomry bond was paid. The net proceeds of the sale of the ship were $10,097.65, the freight collected was $12,606.68, and the amount contributed for general average was $5798.38. The balance after payment of expenses and the bottomry bond is $8704.34, belonging either to Odenheimer & Cook, in right of their mortgage on the ship, or to Joseph Cabot, liquidating partner of Bevan & Humphreys, in right of the assignment of the freight to them as collateral security. The rights of the parties depend upon the answer to be given to the question, to which of the funds placed in the hands of S. & W. Welsh was the bottomry bond properly chargeable. That bond, though junior in date, was the first lien upon both the ship and the freight, paramount to any mortgage or assignment of either. It is insisted, however, that it should have been paid first out of the proceeds of the sale of the ship, and the general average which was a contribution for the repair of the ship, and that the freight was only liable after these two funds were exhausted. No doubt, in cases of bottomry, upon both ship and cargo, be-

[Welsh *v.* Cabot *et al.*]

longing to different owners, the bond is to be first satisfied out of the ship, and the cargo is only secondarily liable, for the expenditure was made for the benefit of the ship's owner. But the reason fails, and with it the rule, when both ship and cargo belong to the same person. Then there has been no lending of the credit of the cargo to the ship, and there is no reason arising out of the rights of others why both ship and cargo are not equally liable. So when the ship and the freight have the same owner, and are both hypothecated, there is no equity anywhere which forbids the creditor from resorting to either in the first instance for the payment of his bond. And this, if possible, is more palpably so in regard to freight than it is when ship and cargo are included in the same hypothecation, for the freight is considered as an incident of the ship.

Thus, in the case of the Prince Regent, cited by Abbott 106, a bond had been given on ship and cargo only, not mentioning the freight. The ship proved insufficient to pay the bond, but the cargo was ample. Lord Stowell decreed that the bondholder should be paid the balance of the proceeds of the ship, wages deducted, and to be put in possession of the cargo so far as was necessary for the full payment of the bond. The freight had been paid over to other parties. But the owner of the cargo prayed a monition against the owners of the freight, who rested their defence on this, that the freight was not bound, not being named in the bond. Lord Stowell required the freight to be brought in, and decided that the ship and freight must be exhausted before resort was had to the cargo. In Morrison *v.* Parsons, 2 Taunt. 407, it was ruled that if the owner of a ship, having chartered her for a voyage, assigns her before the voyage, though he afterwards assign the charter-party to another, if she earns freight, the assignee of the ship is entitled to the freight, as incident to the ship.

Had Diehl & Co. made no assignment of the freight to Bevan & Humphreys, it is clear that they could not have insisted on the payment of the bottomry bond first out of the proceeds of the ship. On the contrary, Odenheimer & Cook would have been entitled in equity to have had it paid primarily out of the freight. The bond was a paramount lien upon both ship and freight, and its holder would have been compelled to resort to that fund upon which the mortgagees had no security, and to exhaust it before coming upon the other. And what difference can it make that Diehl & Co. assigned the freight? Even if the assignment was for a valuable consideration, it was still subject, in common with the ship, to the paramount lien of the bottomry bond, and it was subsequent to the mortgage to Cook & Odenheimer. Now the rule is fully established in this state, that if several pieces of property encumbered by a common lien, be successively alienated

by the debtor, they are in equity to discharge the lien in the inverse order of their alienation: Nailor *v.* Stanly, 10 S. & R. 450; Cowden's Estate, 1 Barr 267; Carpenter *v.* Koons, 8 Harris 226. It is true, that when the ship was mortgaged, and when the freight was assigned, there was existing only a possibility of a superior common encumbrance, but the possibility became a real paramount lien by the bottomry bond.

And still more, the case shows that Bevan & Humphreys were not assignees of the freight for a valuable consideration. They took it as a collateral security for an antecedent debt, paying nothing for it at the time the transfer was made to them. That the holder of a chose as a collateral security for an antecedent debt is not a holder for value, was decided in Petrie *v.* Clark, 11 S. & R. 377, in Hartman *v.* Dowdel, 1 Rawle 282, and it has often been decided since. In his hands it is subject to all the equities which existed against it in the hands of the assignor. If, therefore, the freight of the Venice, in the hands of Diehl & Co., would have been primarily liable, or even only equally liable with the ship to pay the bottomry bond, its liability must remain unchanged by the pledge to Mr. Cabot as liquidator of Bevan & Humphreys. He not only had paid nothing for it, but he knew at the time when he took the assignment that it was liable to respond to any bottomry bond that might thereafter be given upon it and the ship. He is not, therefore, in a situation to ask a chancellor to give him the freight at the expense of the mortgagees of the ship, who had an equity to have it go in relief of the hypothecation in bottomry.

These principles tend directly to the conclusion that the freight should first be applied to the discharge of the bottomry, in marshalling the equities between Odenheimer & Cook and Mr. Cabot, and so I think we should decree. A majority of the court, however, are of opinion that the bottomry bond should be charged *pro rata* upon the freight, and the proceeds of the sale of the ship, and therefore a decree will be so made.

The decree entered at Nisi Prius must be reversed, and the fund in the hand of the complainants distributed as follows:—

The expenses agreed to be paid by the Messrs. Welsh are to be considered as having been paid out of the general average, and the remainder of the average as applied to the bottomry. The balance of the bottomry bond is to be treated as paid *pro rata* out of the freight, and the net proceeds of the sale of the vessel. After these payments thus made, the unappropriated portion of the freight will be decreed to Joseph Cabot, and the unappropriated portion of the proceeds of sale of the ship to Odenheimer & Cook. The result will be the following:—Of the sum remaining in the hands of the Messrs. Welsh, $3823.78 will be decreed

[Welsh *v.* Cabot *et al.*]

to Odenheimer & Cook, and $4835.56 will be decreed to Joseph
Cabot.   The costs are to be paid by Odenheimer & Cook and
Joseph Cabot equally.

Let a formal decree be so prepared.